OA 91  Criminal Complaint

# United States District Court

**FILED**

MAY X 2 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

NORTHERN DISTRICT OF CAILFORNIA

UNITED STATES OF AMERICA
V.

MAURICE JEROME ST. JAMES, JR.
aka "Maurice James"

CRIMINAL COMPLAINT

Case Number: 3  08  70264

EMC

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about __April 20, 2008__ in __San Mateo County__ County, in the __Northern__ District of __California__ defendant(s) did,

(Track Statutory Language of Offense)

knowingly and intentionally possess with intent to distribute a Schedule II controlled substance, namely, approximately 78.9 grams of a mixture and substance containing a detectable amount of cocaine base in the form of crack cocaine.

in violation of Title __21__ United States Code, Section(s) __841(a)(1), (b)(1)(A)(iii)__ .

I further state that I am a(n) __FBI Special Agent__ and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT OF FBI SA MATTHEW S. BEAUPAIN

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Approved As To Form: _JCM JAMES C. MANN for_ AUSA GARTH HIRE
AUSA

MATTHEW S. BEAUPAIN
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

May 2, 2008                     at   San Francisco, California
Date                                  City and State

HON. EDWARD M. CHEN, U.S. MAG.
Name & Title of Judicial Officer            Signature of Judicial Officer

NORTHERN DISTRICT OF CALIFORNIA           )
                                          ) ss:
COUNTY OF SAN FRANCISCO                   )

### AFFIDAVIT

I, Matthew S. Beaupain, Special Agent of the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

I.   **INTRODUCTION**

1.   I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since 2005. For approximately the past two years, I have been assigned to the San Francisco Office of the FBI, and have investigated cases involving violent gangs, drug trafficking activity and violent fugitives. During this time, I have participated in numerous local and federal search warrants and arrests involving alleged narcotics trafficking. I have received training at the FBI Academy in Quantico, Virginia, including training on Violent Street Gangs, Criminal Case Management, Informant Development, Title III Investigations and the identification, use, packaging and sales of controlled substances.

2.   Through my training and experience, I have become familiar with the manner in which narcotics traffickers smuggle, package, transport, store and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded communications and slang-filled conversations, false and fictitious identities, and other means to facilitate their illegal activities and to thwart law enforcement investigations. I have had discussions with other law enforcement personnel about the packaging and preparation of narcotics, the methods of illegal narcotics trade, and the security measures that narcotics traffickers often employ. I have also examined documentation of various methods by which methamphetamine, cocaine, marijuana, and other illicit drugs are smuggled, transported and distributed. I have participated in surveillance of narcotics traffickers. During surveillance, I have personally observed counter-surveillance techniques and the ways in which narcotics traffickers conduct clandestine meetings. I have also participated in investigations that involved

1  the interception of wire communications, and I have been directly involved in the review and
2  deciphering of intercepted coded conversations between narcotics traffickers that were later
3  corroborated by surveillance or some other investigative technique. As a federal agent, I am
4  authorized to investigate violations of the laws of the United States and am a law enforcement
5  officer with authority to execute warrants issued under the authority of the United States.
6      3.      This affidavit is being submitted in support of a criminal complaint charging
7  MAURICE JEROME ST. JAMES, JR., also known as "Maurice James" (ST. JAMES), with
8  possession with intent to distribute a Schedule II controlled substance, namely cocaine base in
9  the form of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii).
10     4.      The statements contained in this affidavit are based on information provided to
11 me by law enforcement officers as well as my training, experience, and knowledge of this
12 investigation. Because this affidavit is being submitted for the limited purpose of supporting the
13 issuance of a criminal complaint, I have not included each and every fact known to me
14 concerning this investigation. I have set forth only those facts that I believe are necessary to
15 establish probable cause to support the complaint.
16 II.    **PROBABLE CAUSE**
17     5.      I have reviewed a felony report prepared by Officer Aaron Dixon of the Menlo
18 Park Police Department (MPPD) regarding the arrest of ST. JAMES on April 20, 2008. The
19 report contains the information described below.
20     6.      On April 20, 2008, at approximately 11:35 p.m., Officer Dixon was on patrol and
21 parked facing east on the southwest corner of the intersection of Willow Road and Newbridge
22 Street in Menlo Park, California. Officer Dixon observed a red Chrysler traveling north on
23 Newbridge Street at approximately 40 miles per hour. The vehicle accelerated as it approached
24 the yellow-lighted intersection. The yellow left turn arrow turned red and approximately one
25 second later the vehicle crossed the limit line and turned west onto Willow Road in violation of
26 California Vehicle Code Section 21453(C).
27
28

2

7. Officer Dixon activated his emergency lighting equipment and caught up to the vehicle as it ascended the U.S. 101 overpass on Willow Road. The vehicle yielded near the crest of the overpass. Officer Dixon exited his vehicle and contacted the driver, ST. JAMES, who was the sole occupant of the vehicle. Officer Dixon asked ST. JAMES if he knew the reason he had stopped him. ST. JAMES said, "cuz I barely went through that light." Officer Dixon asked ST. JAMES if he had any identification on him. ST. JAMES provided Officer Dixon with a valid California Driver's License in the name of Maurice James with a date of birth of August 21, 1972.

8. As Officer Dixon spoke with ST. JAMES he observed the odor of marijuana and alcohol emanating from the vehicle's interior. Officer Dixon noticed that the odor of alcohol was coming from ST. JAMES' breath and asked him if he consumed any alcoholic beverages. ST. JAMES responded that he drank three alcoholic energy drinks throughout the day. Officer Dixon asked ST. JAMES to follow the tip of Officer Dixon's finger with his eyes without moving his head. ST. JAMES complied but Officer Dixon noticed a distinct lack of smooth pursuit and horizontal gaze nystagmus with an onset prior to forty-five degrees. Officer Dixon asked ST. JAMES if he still felt the effects of the alcohol and ST. JAMES replied, "not really." At that time, MPPD Officers Ferguson and Del Mundo arrived to assist Officer Dixon.

9. Officer Dixon asked ST. JAMES to exit the vehicle so that Officer Dixon could perform some tests to ensure that ST. JAMES was capable of safely operating his vehicle. ST. JAMES complied and walked to the north sidewalk of Willow Road. As Officer Dixon and ST. JAMES walked to the sidewalk Officer Dixon observed the odor of marijuana coming from ST. JAMES' person. Officer Dixon then asked ST. JAMES if he had anything illegal on his person. ST. JAMES said that he did not. Officer Dixon asked if he could check and ST. JAMES replied "yeah" while raising his arms above his head. Officer Dixon asked ST. JAMES to face away from him and put his hands in the small of his back and ST. JAMES complied.

10. Officer Dixon grasped ST. JAMES' fingers and then reached into ST. JAMES' front right pants pocket and felt a plastic twist containing several hard pebble-like objects. Based on his training and experience, Officer Dixon immediately recognized the object as being

3

consistent with packaged cocaine base. Officer Dixon then removed his hand and withdrew his handcuffs from their holder and told ST. JAMES, "You're not under arrest. You are simply being detained." At that time, ST. JAMES pulled his hands free from Officer Dixon and began to run east along the sidewalk.

11. Officer Ferguson grabbed onto ST. JAMES, causing him to stumble. ST. JAMES escaped Officer Ferguson's grip and ST. JAMES began to regain his balance. Officer Dixon brought ST. JAMES to the ground by wrapping his arms around ST. JAMES' waist and directing his body weight downward. ST. JAMES fell on his stomach with Officer Dixon straddling his lower back. Officer Del Mundo attempted to restrain ST. JAMES left arm and Officer Ferguson attempted to restrain his feet. Despite their physical attempts to restrain ST. JAMES and repeated verbal commands for ST. JAMES to stop resisting, ST. JAMES continued to struggle. ST. JAMES attempted to get to his hands and knees several times and continued to resist arrest. Eventually, the officers were able to detain ST. JAMES in handcuffs.

12. Officer Dixon recovered the twist from ST. JAMES' front right pants pocket and observed that it contained several small individually packaged pieces of an off white rock like substance. Based on his training and experience, Officer Dixon believed the substance to be cocaine base. A further search of ST. JAMES' person revealed a brown paper bag secreted in the left leg of the sweat pants ST. JAMES was wearing under his jeans. The bag contained eleven clear plastic twists containing an off white rock like substance which Officer Dixon, again based on his training and experience, believed to be cocaine base.

13. Based on his training and experience Officer Dixon believed that the cocaine base possessed by ST. JAMES was for distribution and not for personal use. Officer Dixon based this conclusion on the fact that the quantity of cocaine base was in excess of that for personal use, the cocaine base inside the twist was broken up into several small individually wrapped rocks (consistent with packaging for sale), and the twists inside the paper bag contained medium to large pieces. Based on my training and experience, I share Officer Dixon's belief that the crack cocaine possessed by ST. JAMES was for distribution. In particular, the amount possessed is far greater than is necessary for personal consumption and the manner of packaging is consistent

4

1 | with sale, specifically that there were small rocks in individual baggies and two larger rocks from
2 | which smaller rocks would be broken off and put into plastic twists for sale.
3 |     14.    A search of ST. JAMES' vehicle revealed two pieces of a green leafy substance
4 | resembling marijuana inside a small container in a cup holder in the center console. A further
5 | search of the vehicle revealed sixteen twenty dollar bills ($320) in the center console. In the
6 | glove box of the vehicle Officer Dixon located a grinder used to grind marijuana.
7 |     15.    At the Menlo Park Police Station, Officer Dixon advised ST. JAMES of his
8 | *Miranda* rights pursuant to a department issued form. ST. JAMES agreed to waive those rights
9 | and speak with Officer Dixon. ST. JAMES admitted having consumed alcohol and told Officer
10 | Dixon that he believed he had purchased the marijuana a few days ago. When Officer Dixon
11 | asked ST. JAMES why he ran, ST. JAMES replied, "Isn't it obvious?" Officer Dixon asked if
12 | ST. JAMES wanted to get away and ST. JAMES replied, "You could say that." ST. JAMES
13 | declined to speak further about the narcotics in his possession.
14 |     16.    I took possession of the cocaine base in the form of crack cocaine seized by the
15 | MPPD from ST. JAMES on the night of April 20, 2008, and submitted it to the Drug
16 | Enforcement Administration (DEA) Laboratory for analysis. According to DEA Forensic
17 | Chemist Matthew R. Rainsberg, the substance is 78.9 grams of a mixture and substance
18 | containing a detectable amount of cocaine base in the form of crack cocaine.
19 | ///
20 | ///
21 | ///
22 | ///
23 | ///
24 | ///
25 | ///
26 | ///
27 | ///
28 | ///

### III. CONCLUSION

17. For the reasons stated above, I submit that there is probable cause to believe that MAURICE JEROME ST. JAMES, JR. knowingly and intentionally possessed with intent to distribute a Schedule II controlled substance, namely, approximately 78.9 grams of a mixture and substance containing a detectable amount of crack cocaine on April 20, 2008, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii).

_____
Matthew S. Beaupain
Special Agent, Federal Bureau of Investigation

Sworn to before me this
2nd day of May, 2008

_____
HONORABLE EDWARD M. CHEN
UNITED STATES MAGISTRATE JUDGE

6